[No. F017923. Fifth Dist. May 26, 1994.]

SERIAN BROTHERS, INC., Plaintiff and Appellant, v.
AGRI-SUN NURSERY et al., Defendants and Respondents.

## COUNSEL

Parichan, Renberg, Crossman & Harvey, Brent D. Boger, Peter S. Bradley and Richard C. Crossman for Plaintiff and Appellant.

Akana & DeLoache, Velvet A. Chang Hee, Michael P. Akana and Charles M. Banett for Defendants and Respondents.

## OPINION

**ARDAIZ, Acting P. J.**—A commercial grower purchases young peach trees from a nursery and plants them. The trees eventually exhibit symptoms of a disease and are determined to be diseased. The grower sues the nursery. He contends that the trees were already diseased when he purchased them, and that they were not healthy trees as warranted by the seller. If the grower can prove that the trees were diseased when purchased, how are his damages measured? In *Posz* v. *Burchell* (1962) 209 Cal.App.2d 324 [25 Cal.Rptr. 896], this court held that the proper measure of damages was the difference between the value of the land as planted with the trees (or nursery stock) actually delivered and the value the land would have had if it had been planted with nursery stock of the kind warranted. (*Id.* at p. 341.) In the

present case we hold that the *Posz* measure of damages is not the only measure of damages which may be utilized in a case of nonconforming nursery stock, and that a grower/buyer in this situation may instead choose to present expert evidence of lost profits and evidence of other incidental and consequential damages.[1] We conclude that *Posz* was incorrectly decided insofar as it determined that only one measure of damages could properly be utilized in the situation just described. We also conclude that even if *Posz* had been correct when it was decided in 1962, it would have been superseded by California's adoption in 1965 of the Uniform Commercial Code (Cal. U. Com. Code, § 1101 et seq.), which provides for a determination of damages "in any manner which is reasonable." (Cal. U. Com. Code, § 2714.)

## FACTS AND PROCEDURAL HISTORY

Appellant Serian Brothers, Inc. (hereinafter Serian) purchased approximately 1,100 "Davidsun" variety peach trees from respondent Agri-Sun Nursery (hereinafter Agri-Sun).[2] Serian planted the trees in a 15-acre orchard in early 1988. The trees did not perform as expected. Some died and others grew less vigorously than they should have. An agricultural consultant determined that the trees were infected with a bacterial disease known as crown gall.

Serian, contending that the trees had already been infected with the crown gall before the trees had been delivered to Serian, sued Agri-Sun. The third amended complaint contained six causes of action. They were: (1) breach of a written contract ("the health of said trees was an essential element of, and implied in the contract"); (2) breach of an implied warranty of merchantability ("such goods were not fit for the ordinary purposes for which such goods are used in that such trees were diseased at the time of sale"); (3) breach of an implied warranty of fitness for a particular purpose ("such goods were not fit for the particular purposes for which they were required, in that such trees were diseased"); (4) deceit (Agri-Sun "falsely represented . . . that the trees

---

[1]For simplicity, we shall in this opinion use the phrase "the *Posz* measure of damages" to mean the value a parcel of land would have had if it had been planted with nursery stock of the kind warranted minus the value of the land as planted with the nonconforming nursery stock actually received.

[2]The two respondents in this case are Agri-Sun and HPM, Inc. There was testimony that Agri-Sun acted as the agent of HPM, Inc., in selling "Davidsun" variety peach trees. Agri-Sun and HPM, Inc., were represented by the same attorney at trial and are both represented by the same attorney on this appeal.There was a stipulation in the trial court that if Agri-Sun was found liable to Serian, then HPM, Inc., would also be liable. Apparently because of this stipulation, the case was tried as if there was only one defendant, Agri-Sun. Respondents' appellate brief similarly makes no mention of HPM, Inc., except to note on the cover that HPM, Inc., is a respondent and to request on the final page, along with Agri-Sun, an affirmance of the judgment.

. . . were in fact healthy" and suppressed the "fact that said trees were infected"); (5) negligence (Agri-Sun was "under a duty to adequately and properly inspect its trees before selling them" but "negligently inspected" them); and (6) breach of a written contract for the benefit of a third party beneficiary.[3] Serian sought to recover damages which included lost profits and other costs resulting from the alleged breach of contract, breach of warranties, and negligence.

One of Serian's witnesses at trial was Edward A. Yeary, a farm management consultant with a degree in agricultural economics from the University of California at Berkeley. Yeary had extensive experience in making economic analyses on tree fruit orchards. Yeary was retained by Serian's attorneys to provide an expert determination of the amount of economic loss suffered by Serian as a result of the diseased orchard. He described his "standard method" as follows: "Well, the method is to determine the, first of all, the losses suffered in the operation of the orchard, the losses that actually occurred, then to determine what should have happened, to identify what should have happened as well as what did happen. Then the third phase is to determine the losses involved while a new orchard would come into bearing and catch up into full bearing and catch up to the one that should have been there all the time." Yeary testified that the total amount of Serian's loss was $605,323.95. This included $329,460 for replanting the orchard with healthy trees.

After Serian presented its case, Agri-Sun moved for a nonsuit on the basis that the proper measure of damages was the decrease in the market value of the land as a result of the diseased trees, and that Serian had presented no evidence whatsoever on the market value of the land. The court made a "tentative" ruling granting the motion as to all causes of action except the deceit (fourth) cause of action. The trial judge stated that he would be willing to reverse this tentative decision if Serian persuaded him that he was wrong. The trial judge heard further argument on the issue, and on the next court day granted the motion for nonsuit as to all causes of action except the deceit cause of action. The court made it clear that its only basis for the ruling was the court's view that the measure of damages legally required to be used was the amount of any decrease in the market value of the land. In the trial judge's view, he was required by *Posz* v. *Burchell, supra,* 209 Cal.App.2d 324, to utilize this measure of damages.

---

[3]This cause of action alleged that Ito Packing Co., Inc. (Ito), contracted with Agri-Sun to buy the peach trees for the benefit of Serian. Serian contended on all the other causes of action that Ito was merely Serian's agent. Agri-Sun contended that Ito was not Serian's agent. Serian appears to have included this sixth cause of action to cover the possibility that the trier of fact might determine that Ito was not Serian's agent. At the trial which eventually took place on the allegations of Serian's fourth (deceit) cause of action, the jury made a special finding that Ito acted as Serian's agent.

The trial continued on the deceit cause of action. The jury found in favor of defendant/respondent Agri-Sun. Although one aspect of the Agri-Sun defense was the contention that the trees did not become infected until after they were planted in the Serian orchard, the jury was not asked to make any special finding on the question of whether the trees became infected before or after they left Agri-Sun. The jury found only that Agri-Sun did not intentionally conceal, negligently fail to disclose, or negligently misrepresent any material fact known to Agri-Sun at the time of the sale. Serian does not on this appeal raise any issue pertaining to the propriety of the jury's finding on the deceit cause of action. Serian contends that the court erred in granting Agri-Sun's motion for nonsuit on the remaining five causes of action.

*Appellant's Contention*

Appellant contends that the court erred in granting Agri-Sun's motion for a nonsuit on the breach of contract, breach of warranty and negligence causes of action because appellant may recover for lost profits and other costs which appellant incurred as a proximate result of any breach of contract or breach of warranty by, or any negligence of, respondent Agri-Sun. Appellant contends that the appropriate measure of damages is not limited as a matter of law to the amount of any diminution in the value of the land on which the orchard was located.

I.

NONSUIT

The rule governing the granting of a nonsuit is well established.[4] It was stated in *Estate of Lances* (1932) 216 Cal. 397, 400-401 [14 P.2d 768], as follows: "It has become the established law of this state that the power of the court to direct a verdict is absolutely the same as the power of the court to grant a nonsuit. A nonsuit or a directed verdict may be granted 'only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate

---

[4]Code of Civil Procedure section 581c states in part:

"(a) After the plaintiff has completed his or her opening statement, or the presentation of his or her evidence in a trial by jury, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a judgment of nonsuit.

"(b) If it appears that the evidence presented, or to be presented, supports the granting of the motion as to some but not all of the issues involved in the action, the court shall grant the motion as to those issues and the action shall proceed as to the issues remaining. Despite the granting of the motion, no final judgment shall be entered prior to the termination of the action, but the final judgment in the action shall, in addition to any matters determined in the trial, award judgment as determined by the motion herein provided for."

inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.' [Citations.] Unless it can be said as a matter of law, that, when so considered, no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal, or the trial court to set it aside as a matter of law, the trial court is not justified in taking the case from the jury. [Citation.] . . . In other words, the function of the trial court on a motion for a directed verdict is analogous to and practically the same as that of a reviewing court in determining, on appeal, whether there is evidence in the record of sufficient substance to support a verdict." ■ Our review of the trial court's order granting the nonsuit is confined to the question of whether a nonsuit was proper on the grounds upon which the motion for nonsuit was made. This rule is succinctly set forth in *Jacobs* v. *Freeman* (1980) 104 Cal.App.3d 177, 188 [163 Cal.Rptr. 680], where the court stated: "On appeal from the granting of a nonsuit, the reviewing court should consider only the grounds which were before the trial court. The reason for this rule is that the plaintiff should be given the opportunity to correct the deficiencies in his proof before a nonsuit is granted. As observed by Witkin: 'If the court *grants* the motion, the appealing plaintiff should be able to insist that the reviewing court confine its consideration to the grounds specified below notwithstanding the existence of other good grounds; otherwise he is deprived of the opportunity to correct defects.' [Citation.] Thus, in reviewing nonsuits, the appellate courts do not follow the general rule that a judgment should be upheld if it is correct even though the reasons relied upon may be incorrect. [Citation.]"

The question before us is therefore the same question that was before the trial court: assuming that Agri-Sun breached a contract, breached implied warranties and was negligent, did Serian present any evidence that Serian was damaged? In other words, was Serian's showing of $605,323.95 in lost profits and other costs attributable to the presence of crown gall in its peach orchard legally deficient, even if that evidence were to be completely believed by the jury, to demonstrate that Serian was damaged? Or was Serian instead required to demonstrate that the land on which the peach orchard was located suffered a diminution in value?

## II.

### RECOVERY OF LOST PROFITS AND OTHER REASONABLY INCURRED COSTS

On January 1, 1965, the Uniform Commercial Code took effect in California. (Cal. U. Com. Code, § 1101 et seq.; see also Stats. 1963, ch. 819, and

23A West's Ann. Cal. U. Com. Code (1964 ed.) p. 1.) Division 2 of that code, also known as "Uniform Commercial Code — Sales," applies to "transactions in goods." (Cal. U. Com. Code, §§ 2101, 2102.) Provisions describing the implied warranty of merchantability and the implied warranty of fitness for a particular purpose appear at sections 2314 and 2315, respectively. Provisions pertaining to a buyer's measure of damages for breach of an implied warranty by a seller appear at sections 2714 and 2715, respectively.[5] In particular, subdivision (2)(a) of section 2715 states: "Consequential damages resulting from the seller's breach include [¶] (a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." ■ Appellant and respondent both agree that the trees which respondent sold and delivered were "goods."[6] Notwithstanding the language in section 2714 which instructs us that damages resulting from a seller's breach may be "determined in any manner which is reasonable," respondent insists that there is only one way in which damages may be determined as a result of delivery of diseased peach trees, namely by computing the difference between the reasonable market value of the land as planted with the diseased trees and the reasonable market value which the land would have had if the trees had been free of disease. We are of the view that respondent is mistaken. Nothing in the

---

[5]California Uniform Commercial Code section 2714 states:

"Buyer's Damages for Breach in Regard to Accepted Goods.

"(1) Where the buyer has accepted goods and given notification (subdivision (3) of Section 2607) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

"(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

"(3) In a proper case any incidental and consequential damages under the next section may also be recovered."

California Uniform Commercial Code section 2715 states:

"Buyer's Incidental and Consequential Damages.

"(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

"(2) Consequential damages resulting from the seller's breach include

"(a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

"(b) Injury to person or property proximately resulting from any breach of warrant."

[6]See California Uniform Commercial Code sections 2105 and 2107, subdivision (2).

California Uniform Commercial Code (nor any case law interpreting the code) appears to require any such limitation on the manner in which damages may be measured. Furthermore, limiting the buyer to the measure of damages espoused by respondent might in some instances leave a buyer with no remedy at all for a seller's breach of warranty. If, for example, several developers were interested in purchasing the land on which a buyer's peach orchard were located, and wished to build an apartment complex or a new home development there, and did not care whether that land presently contained healthy Davidsun peach trees, diseased Davidsun peach trees, some other type of peach trees, or no peach trees at all, a commercial grower such as appellant would be unable to demonstrate any damages. The land would have the same market value with the diseased trees as it would have had with trees that had been delivered free of disease.

That a buyer of nonconforming peach trees may recover lost profits was recognized in another Uniform Commercial Code jurisdiction, South Carolina, in *Haley Nursery Co., Inc.* v. *Forrest* (1989) 298 S.C. 520 [381 S.E.2d 906]. In *Haley*, the buyer ordered "Springcrest" and "Rubired" peach trees from the seller. The seller was "a nursery that supplies fruit trees to farmers." (381 S.E.2d at p. 907.) The seller sent peach trees that were so labeled. The labeling, however, was incorrect. A shipment labeled "Springcrest" turned out to be "Springbite" trees, which were "much smaller and more susceptible to bacteriosis than the Springcrest variety." (*Id.* at p. 907.) The trees labeled "Rubired" turned out to be "some unknown variety very susceptible to brown rot." (*Id.* at p. 908.) It took approximately a year for the buyer to realize that the trees were not the type he ordered. This was because "[t]ypically, a peach tree will leaf the first year, bloom the second, and fruit the third" and "[t]he only positive means of identifying the tree is to evaluate the fruit it bears" although "leaves and buds give some early indication of variety." (*Id.* at p. 907.) The buyer refused to pay an outstanding bill, and the seller sued to collect on the bill. The buyer counterclaimed for breach of contract and breach of express warranty. (See Cal. U. Com. Code, § 2313.) The seller obtained a verdict of $41,405.35 on the outstanding bill, but the buyer recovered $250,000 on his counterclaim. On the seller's appeal, there was no express contention that the buyer was not entitled to recover lost profits. Rather, the seller contended that the figures used by the buyer's expert were not valid and that the expert's calculation of lost profits as being the difference between "the net revenue of the yield if the trees had been as warranted" and "the net revenue of the yield from the trees as delivered, calculated over the fifteen-year life span of the trees" (381 S.E.2d at p. 908), was erroneous because "[the seller] should not be compensated for twelve years of lost revenue, based upon the fifteen-year lifespan of the trees, when he can replant and minimize his losses." (*Ibid.*) The Supreme Court of South

Carolina rejected the first (invalid figures) argument. It agreed with the second argument (that the computation of the buyers' expert should have accounted for a minimizing of losses), but nevertheless affirmed, noting that the expert had testified to $557,000 of lost profits, that the jury had awarded $350,000, that the trial judge had reduced the award to $250,000, and that the $250,000 was within the range that the buyer would have been entitled to if he had replanted to minimize his losses. The court stated: "Haley [seller] further complains the verdict is excessive because Forrest [buyer] should not be compensated for twelve years of lost revenue, based on the fifteen-year lifespan of the trees, when he can replant and minimize his losses. We agree but find the damages award proper. Haley concedes Forrest is entitled to four years of lost profits for the Springcrest trees and eight years of lost profits for the Rubired trees plus the cost of removal and replanting. . . . The record indicates the $250,000 remitted verdict is within the range of damages conceded by Haley." (*Id.* at p. 908.)

Respondent relies on *Posz* v. *Burchell, supra,* 209 Cal.App.2d 324, a pre-Uniform Commercial Code decision of this court. *Posz* appears to us to be the only California case to hold that a buyer in the position of appellant Serian cannot present evidence of his lost profits, and must instead utilize as the measure of damages the difference between the value of the land as planted and the value the land would have had if the trees had been as warranted. As we shall explain in the next portion of this opinion, it appears to us that the *Posz* rule was an unwarranted extension of the prior California Supreme Court cases on which it purported to rely. The more important point, however, is that even if we are mistaken in this conclusion and even if *Posz* was correct when it was decided in 1962, it has now been superseded by California's adoption of the Uniform Commercial Code. When a seller of fruit trees or berry vines breaches an express or implied warranty made to a buyer, the buyer is no longer restricted to a utilization of the measure of damages prescribed by *Posz*.

III.

*Posz* AND ITS PREDECESSORS

A. *Posz*

In *Posz*, the buyer of boysenberry vines sued the sellers for breach of express and implied warranties and for negligence after three-quarters of the boysenberry plants died. The buyer obtained a judgment of $32,324.61. The trial court had instructed the jury that it could award the buyer damages consisting of "[e]ach item of direct expense . . . 'attributable to the boysenberry vines that failed to grow' " and "[l]oss of profits or income . . .

'attributable to the boysenberry vines that failed to grow' " provided that the jury found these were suffered by the buyer "as a proximate result of the defendants' negligence or breach of warranty upon which you base your finding of liability." (*Posz* v. *Burchell, supra,* 209 Cal.App.2d at p. 341.) This court held that the instruction was erroneous and remanded the case "for retrial as to the question of damages only." (*Id.* at p. 342.) This court stated: "This instruction departs completely from the well-established rule in California for the ascertainment of damages in connection with fruit trees or berry vines. The measure of damages with respect to nursery stock is the difference in reasonable market value between the land as planted to the vines actually delivered by the producer or seller and the land if planted to the vines as warranted. [Citations.] The rule is thus stated in 36 California Jurisprudence 2d, Nurseries and Nursery Stock, section 5, page 576: 'The proper method of ascertaining the damages, when the discovery of the breach cannot be made until after the nursery stock is planted, is to take the difference between the value of the land as planted with the stock delivered and what the value of the land would have been if planted with stock of the kind warranted.' [Citations.]

"Where damage for loss of vines is measured by the amount of depreciation in the value of the land as planted, there is no warrant for allowing further damages for loss of crops which might have been produced in the future because the reduced value of the land necessarily includes the future value of lost crops. [Citation.] Special damages properly pleaded, such as the cost of consolidating the growing vines after the discovery of the extensive death of the plants, may also be recovered. But the cost of the vines and the expense of originally preparing and planting the land are not recoverable as special damages, as these items are covered by the general measure of damages above referred to. Nor would interest on borrowed money be recoverable, as claimed by respondent." (209 Cal.App.2d at pp. 341-342.)

*Posz* cited three early California Supreme Court cases to support its contention that the damage instruction given was erroneous. These were *Shearer* v. *Park Nursery Co.* (1894) 103 Cal. 415 [37 P. 412], *Germain Fruit Co.* v. *J.K. Armsby Co.* (1908) 153 Cal. 585 [96 P. 319], and *Burge* v. *Albany Nurseries, Inc.* (1917) 176 Cal. 313 [168 P. 343]. The first of these, the *Shearer* case, cited the New York case of *Dwight* v. *Elmira etc. R.R. Co.* (1892) 132 N.Y. 199 [30 N.E. 398], and we shall begin our review of these older cases with a close look at *Dwight.*

## B.  *Dwight, Shearer, Germain, and Burge*

In *Dwight* a fire destroyed 21 of the plaintiff's apple trees. The plaintiff sued the defendant for negligence. At trial the plaintiff presented a witness

who was asked " 'What were those twenty-one trees worth when they were killed?' " (*Dwight* v. *Elmira etc. R.R. Co.*, *supra*, 132 N.Y. at p. 200 [30 N.E. at p. 398].) The question was objected to on the ground that an answer to it would "not tend to prove the proper measure of damages." (*Ibid.*) The objection was overruled and the witness answered " 'I should say they were worth fifty dollars apiece.' " (*Ibid.*) The New York Court of Appeals reversed a judgment in favor of the plaintiff and held that the "method of proving damages adopted" by the trial court was "not recognized nor permitted by the courts." (*Id.* at p. 204 [30 N.E. at p. 399].) The court expressed concern with whether fruit trees have any value at all except for "nursery trees grown for market" (which "have a value for transplanting" and therefore a "market value" (*id.* at p. 202 [30 N.E. at p. 398]) in that a fruit tree would die and be of little or no value if it were to be severed from the land to which it is attached. The court stated:

"Fruit-trees, like those which are the subject of this controversy, have little if any value after being detached from the soil, as the wood cannot be made use of for any practical purpose; but while connected with the land they have a producing capacity which adds to the value of the realty. Necessarily the testimony adduced tended to show, not the value of the trees severed from the freehold, but their value as bearing trees, connected with and depending on the soil for the nourishment essential to the growth of fruit. How much was the realty, of which the trees formed a part, damaged, was the result aimed at by the questions and attempted to be secured by the answers." (132 N.Y. at p. 201 [30 N.E. at p. 398].)

The court went on to state the rule as follows:

"[I]n cases of injury to real estate the courts recognize two elements of damage: 1. The value of the tree or other thing taken, after separation from the freehold, if it have [*sic*] any.

"2. The damage to the realty, if any, occasioned by the removal. (*Ensley* v. *Mayor, etc.*, 2 Baxt. 144; *Striegel* v. *Moore*, 55 Iowa, 88, 7 N.W. Rep. 413; *Longfellow* v. *Quimby*, 33 Maine, 457; *Foote* v. *Merrill*, 54 N.H. 490.) A party may be content to accept the market value of the thing taken when he is also entitled to recover for the injury done to the freehold. But if he asserts his right to go beyond the value of the thing taken or destroyed after

severance from the freehold, so as to secure compensation for the damage done to his land because of it, then the measure of damages is the difference in value of the land before and after the injury. In this case the plaintiff was not satisfied with a recovery based on the value of the trees destroyed, after separation from the realty, of which they formed a part,—as indeed he should not have been, as such value was little or nothing,—so he sought to obtain the loss occasioned to the land by reason of the destruction of an orchard of fruit-bearing trees, which added largely to its productive value. This was his right, but the measure of damages in such a case is, as we have observed, the difference in value of the land, before and after the injury; and as this rule was not followed but rejected on the trial, and a method of proving damages adopted not recognized nor permitted by the courts, the judgment should be reversed." (132 N.Y. at p. 204 [30 N.E. at p. 399].)

Nothing in *Dwight* expressly mentions how the testifying witness arrived at his conclusion that the apple trees were worth $50 apiece. One would assume, however, that the witness, if asked, would have given an answer which included a consideration that an apple tree's value was directly proportional to the tree's fruit-producing capability. The appellate court's view was simply that because a tree is a part of the realty on which it sits, its "producing capacity . . . adds to the value of the realty" and not to the value of the tree. (132 N.Y. at p. 201 [30 N.E. at p. 398].) It would seem that if the witness had instead testified that the destruction of the 21 apple trees had reduced by $1,050 (i.e., by 21 x $50) the value of the land on which the trees stood, this may well have been considered acceptable testimony at the time of the trial of Mr. Dwight's case. It seems unlikely that the *Dwight* court would have deemed the dollar amount which the "producing capacity" of the trees adds to the value of the realty to be anything significantly different than the amount by which the owner could profit by selling the apples grown on those trees.

In *Shearer* the plaintiff bought nursery peach trees from the defendant and planted them. After "about two years, when they first bore fruit," the plaintiff realized that 268 of the 500 trees were "of a different and inferior variety" than the specific varieties he had ordered. The plaintiff sought to recover "damages alleged to have been suffered . . . in consequence of a breach of the warranty that the trees were of the kinds ordered." (*Shearer* v. *Park Nursery Co.*, *supra*, 103 Cal. at p. 417.) The plaintiff sought to prove his damages by presenting evidence of (1) the value the land would have had at the time the breach of warranty was discovered if the 268 nonconforming

trees had been the varieties ordered by the plaintiff, and (2) the value the land had at the time the breach was discovered and as actually planted with the nonconforming trees. He contended that his damages were the difference between those two figures. The trial court admitted the evidence. The California Supreme Court affirmed and stated:

"The sole effect of such evidence was to prove the difference between the value of trees of the kinds ordered by plaintiff and the trees actually delivered by defendant *at the time when those delivered first bore fruit*, that being the earliest date at which plaintiff discovered, or could have discovered, the breach of the warranty. It was, however, to the mode of proving this difference of values that defendant more specially objected, which was: 1. To prove the value of the land occupied by the trees at the time the breach of warranty was discovered; and 2. The value the land would have had at the same time if trees of the kinds and proportions ordered by plaintiff had been planted and cultivated, instead of the two hundred and sixty-eight trees of a kind not ordered by plaintiff.

"It is strenuously contended that the allowance of any evidence of the value of the land was material error, for which the judgment should be reversed. But since growing fruit-trees are a part of the land, and probably of no value when severed from it [citation], it was proper to prove how much the different kinds of trees added to the value of the land; and the difference between the value thus added by the trees delivered and the value that would have been added if the trees ordered had been planted instead of those seems to be the measure of plaintiff's damage, according to section 3313 of the Civil Code. 'It is settled in New York,' says Mr. Sutherland (Sutherland on Damages, sec. 1019), 'that where fruit-trees are destroyed or injured, and their owner asserts his right to go beyond their value after severance from the land, so as to obtain compensation for the damage done the latter, his recovery is measured by the difference between the value of the land before and after the injury.' [Citation.]

"On the assumption that the mode of proof was not materially erroneous, the findings of fact are justified by the evidence." (103 Cal. at pp. 419-420.) There is no mention in *Shearer* of what the two land value figures were or how they were arrived at by whomever gave the land value testimony. Nor does the case mention what the defendant contended the proper measure of damages should have been. It is also noteworthy that the method of proving damages approved of by the California Supreme Court in *Shearer* was the method actually utilized at trial by the plaintiff in that case. To disapprove of the plaintiff's method of proving damages would presumably have resulted in a reversal. The court's comment that "the mode of proof was not

materially erroneous" sounds less like a statement that the *Posz* measure of damages *must* be used, and more like a statement that use of the *Posz* measure is permissible.

The *Germain* case, cited in *Posz*, is not authority for the proposition that the *Posz* measure of damages must be used. In *Germain* the plaintiff bought a lot of dried apricots from the defendant. The plaintiff contended that the apricots delivered were inferior in quality to the samples he had been shown, and that this constituted a breach of warranty. The plaintiff presented evidence that he paid $4,352.25 for the apricots, which were to be delivered to Philadelphia, and that he could have sold them in Philadelphia for $4,974 (a profit of $621.75) if they had been as warranted. Instead, he could sell them in Philadelphia for only $3,225.78, which he did. The trial court awarded him $1,126.47 (the difference between what he paid for the apricots and what he subsequently sold them for) in damages. He contended on appeal that he should have also received his $621.75 lost profit for a total award of $1,748.22. The California Supreme Court agreed that the appropriate measure of damage would include the lost profits, but reversed the judgment because the defendant also appealed and convinced the court that parol evidence of an express warranty of quality had been erroneously admitted and that no such warranty appeared in the written agreement between the parties. *Shearer* is cited in *Germain* only with reference to another issue that was decided in *Shearer*, namely that damages should be measured as of the time the breach of warranty is, or with due diligence might be, discovered by the purchaser, even if the seller has delivered nonconforming goods at an earlier time. (In *Shearer* the buyer did not discover the breach until the trees first bore fruit, even though he had received the trees about two years prior to his discovery of the breach.) In *Germain* the court's only reference to *Shearer* was the statement that: "The place of delivery being the same as the place of inspection and resale, there was no reason for the application of the rule declared in *Shearer* v. *Park Nursery Co.* . . . ." (*Germain Fruit Co.* v. *J.K. Armsby Co., supra*, 153 Cal. at p. 590.)

*Burge*, the third of the three cases cited by *Posz*, is similar to *Shearer*. The buyer purchased prune trees which were represented by the seller to have been "grafted on myrobalan roots." (*Burge* v. *Albany Nurseries, Inc., supra*, 176 Cal. at p. 315.) The buyer received the trees in December of 1910. In the spring of 1913 "suckers from the roots disclosed the fact that they were grafted on peach roots and not on myrobalan roots." (*Ibid.*) The buyer's farm was unsuitable for the growth of trees grafted on peach roots but was suitable for trees grafted on myrobalan roots. The buyer presented evidence of the value the land would have had in April of 1913 (when the breach was

discovered) if it had been planted with trees grafted on myrobalan roots, and evidence of the value of the land in April of 1913 as actually planted with the trees grafted on peach roots. His damages were the difference in these two values. The defendant's primary contention on appeal appears to have been that "the time of ascertaining the damages was either the time of delivery or the time when the plaintiff discovered the peach-pits clinging to the roots in April, 1911." (*Id.* at p. 318.) The court then stated that "[t]he case is not to be distinguished on this point from *Shearer* v. *Park Nursery Co.* [Citation.]" (*Ibid.*) It pointed out that the issue of "when the discovery might have been made by reasonable diligence" was a question of fact for the jury and "was properly submitted to the jury . . . ." (*Id.* at p. 319.) It also pointed out that the jury had been given evidence and instructions so that if the jury determined that the breach should reasonably have been discovered by the plaintiff in 1911, it would have calculated damages as of that time and not as of April 1913. The California Supreme Court found that there was no error and affirmed the judgment in favor of the plaintiff. Just as in *Shearer*, nothing in *Burge* provides any further information about what the land values were, or how the person or persons testifying about those values calculated or estimated the values. It is also noteworthy that *Burge* described Civil Code section 3300 as providing that "damages for breach of an obligation are measured by the amount which would compensate the party aggrieved for all the detriment proximately caused thereby, or which in the ordinary course of things would be likely to result therefrom." (176 Cal. at p. 318.) Civil Code section 3300 reads the same today as it did in 1917.[7] And the "California Code Comment" to California Uniform Commercial Code section 2715 (pertaining to incidental and consequential damages) states that California Uniform Commercial Code section 2715 "is consistent with rules of damages set forth in . . . Civil Code sec. 3300 ('all the detriment proximately caused' by the breach)."

## C. *Posz Construed Earlier Cases Too Restrictively*

*Posz* appears to be the only case in which the buyer of a fruit tree or berry vine used evidence of lost profits and other incurred costs as proof of his damages, and was then told by an appellate court that this was improper. We view *Shearer* and *Burge* as having held only that the *Posz* measure of damages is a permissible measure of computing damages, and not as having determined that the *Posz* measure is the *only* permissible measure of damages.

---

[7]Civil Code section 3300, enacted in 1872, still states: "For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."

The discussion in *Posz* of the measure of damages also mentions two other cases, *Montgomery* v. *Locke* (1887) 72 Cal. 75 [13 P. 401] and *Hill* v. *Morrison* (1928) 88 Cal.App. 405 [263 P. 573]. *Montgomery* states that " '[t]he value of fruit-bearing trees is to be estimated with reference to what they are worth on the premises in their growing state, and not as taken up and removed from the place.' " (*Montgomery* v. *Locke, supra,* 72 Cal. at p. 77.) In *Montgomery* the court affirmed a judgment in favor of a plaintiff whose fruit trees and land had been damaged by an overflow of water caused by the defendants. The opinion does not say, however, what measure of damages was used or what evidence was presented by the plaintiff to prove his damages. *Hill,* on the other hand, is interesting because *Hill* approved of use of the same type of testimony that was deemed improper in *Dwight.* And *Dwight* was the case subsequently relied on in *Shearer.* In *Hill* a witness testified as follows about the value of fruit trees that had been damaged by the defendants' cattle: "Q. Mr. Ford, where did you obtain the eight dollars valuation that you placed on the Rome Beauty trees of that age? A. Well, that is what I would consider a fair valuation of the Stetson Orchard, considering the age of the tree and the location and the variety of the tree. Q. Did that eight dollars per tree include the land value that it is growing in? A. Well, I would say that it would be a part of the land value—that is, you really might calculate the land and the trees growing together, but the trees have, I would consider, have a value themselves, of eight dollars." (88 Cal.App. at p. 410.) Even though this testimony does not appear to be any different in its nature than the testimony in *Dwight* that the apple trees were worth $50 each, the *Hill* court simply construed this testimony to be the equivalent of testimony that the value of the land with the trees was higher than the value of the land without the trees, and that the amount of the difference in value was $8 times the number of trees. The court stated: "It requires no argument to arrive at the conclusion that the witness was in effect testifying that the land with these trees was worth $8 more per tree than without them, and was worth proportionately less through the extent of their injury." (88 Cal.App. at p. 410.) Perhaps more importantly, however, *Hill* appears to suggest that if the plaintiffs had instead chosen to prove damages by presenting evidence of the value of the fruit the trees would have produced if there had been no tree damage (i.e., lost profits), this would have been permissible. The court stated: "There is no claim or intimation in this case that the plaintiffs are asking for damages on a sentimental ground. On the contrary, the evidence responds to the allegation in the complaint referring to damage to the trees and only to the theory of a pecuniary loss. Fruit trees, under this theory, are valuable only because they produce valuable fruit. *This value may be considered by a direct evaluation of the fruit itself or as an added value of the land with the fruit-producing trees thereon.* The evidence adduced was that each tree, according to its age, condition and

kind, was worth a specific sum; that those destroyed were thereafter worth nothing, and that those injured were worth sums proportionate to their normal condition. This worth, of course, related to the added worth of the ground with the trees, over the worth of the ground without the trees, and was a proper method of determining the damage. [Citations.] *Since the method used considered the value of the trees as fruit producers, it follows that an added sum for the crop itself would have been counting the damage twice*, and hence the allegation in the complaint referring to fruit as an added damage is pure surplusage." (*Id.* at p. 408, italics added.)

Other cases have approved of the awarding of damages for injury to fruit-producing trees even though the amount of damage was not measured solely by a reduction in the value of the land. No mention was made in *Posz* of *California O. Co.* v. *Riverside P.C. Co.* (1920) 50 Cal.App. 522 [195 P. 694]. In *California O. Co.*, cement dust from the defendant's cement mill settled on the plaintiff's orange trees during the years 1910, 1911, and 1912. In January of 1913 the defendant equipped its mill with a dust-catching apparatus. The action was then filed later in 1913. The plaintiff was awarded a total of $6,300, consisting of $3,500 for loss and injury to the crops for the years 1910, 1911, and 1912, $300 for increased labor and cost in the care of the trees, and another $2,500 for injury to the trees. The award was affirmed on appeal. The court reasoned that the $2,500 award for injury to the trees was for injury that took place in 1913 and 1914 as a result of the continuing effects of the previously emitted cement dust. The dust that "encrusted on the leaves" in 1912 "would remain on those leaves for the period of their life, which is between two and three years, meanwhile seriously interfering with plant respiration and the formation of starch and sugar, thereby tending to tree starvation." (*Id.* at p. 531.) The court added that "[t]he injury caused by the dust that settled on the trees in the years 1911 and 1912 would, therefore, naturally tend to decrease the 1913 and 1914 crops." (*Ibid.*) The fact that the oranges had not yet been severed from the trees when the cement dust settled on the trees in 1910, 1911 and 1912 did not cause the court to find any error in the awarding of $3,500 for "loss of and injury to the orange crops during the years 1910, 1911 and 1912." (*Id.* at p. 530.)

In *Andreen* v. *Escondido Citrus Union* (1928) 93 Cal.App. 182 [269 P. 556], the defendant's agents negligently fumigated the plaintiff's lemon trees and orange trees. The opinion states that plaintiff's complaint "alleged that plaintiff had suffered by reason of loss of his crop and in the further respect that his trees had become permanently damaged and set back and, as a consequence, the market value of his orchard had been lessened." (*Id.* at p. 185.) The jury returned a general verdict in favor of the plaintiff in the amount of $2,250. On appeal the defendant contended that there was insufficient evidence to support the verdict. The appellate opinion concluded that

"[t]here is evidence of loss of crop and evidence of damage to the trees amply sufficient to support the amount of damages awarded by the jury." (*Id.* at p. 186.)

In *Kolberg* v. *Sherwin-Williams Co.* (1928) 93 Cal.App. 609 [269 P. 975], the plaintiff's trees were sprayed with a product manufactured by the defendant. This "resulted in serious injury to the trees sprayed and in loss of a large portion of the crop of oranges." (*Id.* at p. 611.) The plaintiff had a court trial. The trial court "allowed the plaintiff $1,900 as loss to his orange crop for the 1924 season and $4,200 as damage to the orchard." (*Id.* at p. 613.) The evidence showed that the plaintiff "received from 2,340 boxes of oranges picked from sprayed trees the sum of $1,981 less than the average price which he received for oranges picked from trees which had not been sprayed and which were sold at the same time." (*Id.* at pp. 613-614.)

Both appellant and respondent call our attention to *Rilovich* v. *Raymond* (1937) 20 Cal.App.2d 630 [67 P.2d 1062]. In *Rilovich*, damage to orange trees was alleged to have been caused by the breach of a written agreement to supply water. The tree owner "successfully contended before the trial court that the proper measure of damages to the trees themselves was the cost of restoration of the trees, plus the value of the crops that would have been grown, during the time that was lost, had the trees not been destroyed." (*Id.* at p. 645.) The appellate court, after stating that the proper measure of damages was "the amount of depreciation in the value of the land caused by the loss of or damage to the trees" (*id.* at p. 644), appeared to reject the tree owner's contention that depreciation in value was one method but not the exclusive method of measuring the damages. The court stated: "The rule of damages in such case is as we have stated it, namely, the depreciation in the value of the land, and this is exclusive of every other kind of damage to the trees themselves. Respondent suggests that both rules are applicable, and that he may rely upon either. We see a vast difference, however, between the restoration of a part of an established crop of alfalfa, which can be accomplished readily and with a fair measure of certainty, and the restoration of such an orange grove as the one involved in the present case." (*Id.* at pp. 645-646.) *Rilovich* does not attempt to explain what the "vast difference" would be between restoring an established alfalfa crop and restoring an established orange orchard. Furthermore, *Rilovich* states that the reduction in the value of the land is equivalent to, or at least is "based upon," the value of the lost orange crop. The court stated: "The value which bearing orange trees add to land is based upon the value of crops which they might bear. When the loss of the tree is compensated in damages to the full value, the value takes the place of the tree and there will be no future crops to consider." (20 Cal.App.2d at p. 645.) If computing or estimating the depreciation in the value of the land involves computing or estimating the profits

lost as a result of the loss of the oranges, why is it improper to present evidence directly on the amount of the lost profits? Neither *Rilovich* nor *Posz* nor the respondents offer any satisfactory answer to this question. Indeed, even at the trial of the deceit cause of action in the present case, respondent's attorney voiced no criticism of Mr. Yeary's testimony in respondent's attorney's final argument to the jury. The argument was merely that respondent was not liable for those alleged damages. *Rilovich* at first appears to be completely in accord with the later *Posz* decision, but it is not. Only one page after saying that the depreciation in the value of the land "is exclusive of every other kind of damage to the trees themselves" (20 Cal.App.2d at p. 645), the court then nevertheless goes on to say that "[i]f plaintiff lost growing orange crops in whole or in part because of the failure of any of the defendants to furnish water . . . when the plaintiff needed it, he may recover the value of the crops lost." (*Id.* at p. 646.) The opinion states that the plaintiff may recover the value of the crops lost only up to a certain point in time, but not "beyond the date with relation to which damage to the land is fixed." (*Ibid.*) Why some lost crops do not constitute damage to the land, the opinion does not say.

This court in *Baker* v. *Ramirez* (1987) 190 Cal.App.3d 1123 [235 Cal.Rptr. 857] decided that the measure of damages for the tortious removal of "two rows of orange trees from a twenty-foot wide strip of property" (*id.* at p. 1129) was not required to be the amount of reduction in the value of the property. We stated:

"The measure of damages for tortious injury to property is 'the amount which will compensate for all the detriment proximately caused thereby . . . .' (Civ. Code, § 3333.) There is no fixed rule for the measure of such damages. [Citation.] One measure is the difference between the value of the property before and after the injury. However, an alternative measure is the cost of restoring the property to its condition prior to the injury. [Citation.] Whatever measure is the most appropriate to compensate the injured party for the loss sustained in the particular case is the one which should be adopted. [Citation.]

". . . . . . . . . . . . . . . . . . . . . . .

"Here, there is no impediment to replacing the orange trees and, considering the small portion of the grove which was damaged, it is reasonable to do so. Thus, the cost of restoring the grove is the most appropriate measure of damages in this case. The orange trees are valuable only because they

produce valuable fruit, and their worth is a proper method of determining the damage to the grove. [Citation.]" (190 Cal.App.3d at p. 1137.)

Lost profits have been recoverable as damages in numerous similar cases involving breach of warranty. (See, e.g., *Klein* v. *Asgrow Seed Co.* (1966) 246 Cal.App.2d 87 [54 Cal.Rptr. 609] [tomato seed]; *Shoemake* v. *F. H. Woodruff & Son, Inc.* (1964) 227 Cal.App.2d 587 [38 Cal.Rptr. 817] [onion seed]; *Hayman* v. *Shoemake* (1962) 203 Cal.App.2d 140 [21 Cal.Rptr. 519] [onion seed]; *Paul* v. *Williams* (1944) 64 Cal.App.2d 696 [149 P.2d 284] [tomato plants]; *Newhall Co.* v. *Hogue-Kellog Co.* (1922) 56 Cal.App. 90 [204 P. 562] [lima bean seed].) It is true that none of these five cases involved fruit trees, but respondent has not provided any satisfactory explanation for treating commercially grown peach trees in a different manner. Respondent cites *Cottle* v. *Spitzer* (1884) 65 Cal. 456 [4 P. 435], which pointed out that because fruit trees are not generally considered to be "growing crops," a state constitutional provision exempting "growing crops" from taxation did not bar the assessor from assessing growing fruit trees. *Cottle* has nothing to do with applying a measure of damages for breach of warranty, breach of contract, or negligence, and we do not find it helpful here. Respondent also argues that because Civil Code section 3313, as it read when *Shearer* was decided in 1894, is similar to subdivision (2) of the present day California Uniform Commercial Code section 2714, we should therefore deem the *Posz* measure of damages as being the only measure of damages that is sufficiently reasonable to be utilized in the present situation. This contention is flawed for two reasons. First, as we have already explained, we do not view *Shearer* as having held that the *Posz* measure of damages was the only permissible measure of damages which could be used to remedy a breach of warranty pertaining to fruit trees. Second, even if *Shearer* were to be read as holding that the *Posz* measure of damages was the only permissible measure of damages, another portion of section 2714 now provides for damages to be "determined in any manner which is reasonable." Subdivision (3) of section 2714, as well as section 2715, now also expressly provides for the recovery of incidental and consequential damages.[8]

---

[8]At oral argument Agri-Sun also argued that even if more than one measure of damages could properly be used in a case such as this, the trial court could select what it deemed to be the most appropriate of those available measures and require the plaintiff to proceed in that fashion, and that this is what the trial judge did in this case. We reject this argument for at least two reasons. First, this is not what the trial judge did in this case. The trial judge granted Agri-Sun's motion for a nonsuit because, as the trial judge himself stated, "I feel bound to follow the Posz decision that has not been overruled." Second, if a plaintiff has a choice of two or more legally permissible ways to prove his damages, then the plaintiff, and not the court, is entitled to make the strategic decision of how to go about attempting to prove his case. Agri-Sun presents no authority for its novel contention that the court can make such a strategic decision.

## IV

### DISPOSITION

The trial court's granting of nonsuit as to the first, second, third, fifth and sixth causes of action is reversed for the reasons stated. Accordingly, the trial court's award of attorney fees and costs is reversed. In all other respects the judgment is affirmed. Costs on appeal to appellant.

Vartabedian, J., and Harris, J., concurred.